# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

### NO. 03-06-00589-CR

**Terry Michael Dalton, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
NO. D-1-DC-05-201498, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING**

## O P I N I O N

We withdraw our opinion and judgment dated February 1, 2008, and substitute the following in their place. We overrule appellant's motion for rehearing and motion for rehearing en banc.

Terry Michael Dalton appeals from a guilty plea to the murder of his spouse following the district court's order denying appellant's motion to suppress statements. *See* Tex. Code Crim. Proc. Ann. art. 44.02 (West 2006). At issue is the admissibility of appellant's videotaped custodial interrogation obtained by Austin police officers. The trial court determined that appellant voluntarily waived his rights and that his statement to an officer asking him to tell his friends to get him a lawyer

was not a direct, unequivocal invocation of his right to counsel. We agree with the trial court's conclusion and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 2005, Austin police officers, including Officer Paul Basulto, were summoned to 4802 Clarkson to assist an EMS unit. A deceased female, Laura McIntosh Dalton, was in the house, and appellant was present on the scene outside the house. When Basulto arrived at the scene, he observed appellant and two women. Appellant matched the description of the possible suspect. For his own security, Basulto approached appellant, handcuffed appellant's hands behind his back, and frisked him for weapons. Appellant identified the two women as his friends and asked Basulto, "Would you give my friends my keys that are in my pocket?" Basulto agreed, placed appellant in the back seat of the squad car, and turned on the car's video camera, which he directed at appellant.

In the car, Basulto advised appellant of his rights and appellant acknowledged he understood them. Basulto testified at the hearing on the motion to suppress that he considered appellant to be under arrest. Appellant then asked Basulto: "When you give my friends the keys, could you tell them to get me a lawyer?"[1] Although the tape is at times inaudible, Basulto assured appellant that "we'll probably do that in a little bit" and asked appellant for the names of his friends. Over the next few minutes, appellant also asked the officers to obtain medications from his house, to pass along messages to his father, and to take care of his dogs. Basulto recounted to other

---

[1] Although the State urges that appellant asks Basulto to "ask" his friends to get him a lawyer, the videotape is not clear and we will defer to the trial court's factual finding.

officers that appellant wanted the keys in his pocket to be given to his friends, that the officers ask his friends to get him a lawyer, that the officers retrieve his medications from his house, and that his father be contacted.

When homicide Detective Michael Burgh arrived, he approached the patrol car and spoke with appellant. Burgh explained that the officers needed appellant's consent to go into the house and conduct their investigation. He asked appellant for his consent, and inquired, "Do you have a problem with that?" After an exchange that is inaudible on the videotape, appellant consented and executed the consent form.

Burgh then advised appellant that he would be transported to the police station and that detectives would speak with him there. Appellant asked whether he could get a lawyer then and confirmed in response to a question from Burgh that he had been advised of his rights. Burgh replied that if appellant wanted a lawyer, he could have a lawyer and that his rights would be explained to him in more detail at the police station. Appellant then asked for his eyeglasses and again for his prescription medicines.

For the next half hour, appellant continued to ask Basulto various questions, including about what was going to happen. Basulto replied that he did not know what was going to happen, but that appellant could ask the detectives his questions when they spoke at the police station. Appellant asked about his anti-anxiety medication and when his friends would get his messages. Someone off-camera replied, "They're probably gonna have to go make a statement, so they'll let them know then." When asked if that was "okay," appellant nodded. Appellant again asked about his dogs and was assured they would be taken care of.

3

Approaching appellant in the patrol car a few minutes later, homicide Detective Kerry Scanlon introduced himself and advised appellant they would be leaving soon. Several minutes later, Scanlon and Basulto discussed transporting appellant to the police station and how to address appellant's concerns about his medications and dogs. Basulto then transported appellant to the police station.

At the police station, appellant was placed in an interrogation room and Scanlon advised appellant of his rights. Scanlon told appellant that he knew Basulto had advised him of his rights, but that he would do so also. After Scanlon read appellant his rights, appellant confirmed that he understood them. Scanlon then explained to appellant that he wanted to talk about "what happened" and asked appellant if he would be willing to talk about it. Appellant responded, "Well, should I get a lawyer first?" Scanlon advised appellant that that was a decision for appellant to make and that Scanlon could not advise him one way or the other. Scanlon again explained that appellant had a right to a lawyer and that Scanlon needed to figure out whether appellant wanted to talk about what had happened. Appellant said that he had never done this before and asked if people usually get a lawyer before they "talk." During an extended conversation in which Scanlon told appellant that some people did and some people did not, and answered appellant's questions about the process of getting a lawyer, appellant agreed to acknowledge in writing that he understood the warnings and wanted to waive those rights in order to make a statement.

Appellant then proceeded to respond to Scanlon's questions about how he had met his wife and what their marriage had been like. Appellant described how his wife had assaulted him on one occasion for which she was arrested, and he talked about the troubles they had in their

4

marriage. He started to describe a fight he and his wife had had the night before, explaining that he wanted a divorce. Appellant recounted that his spouse had called a friend, telling her that appellant was hitting her, which he denied doing. Appellant described how his wife had threatened him and sat on his chest trying to suffocate him. He struggled to get her off. Appellant then said, "I guess I should get a lawyer before I really get into what happened."

Appellant again asked Scanlon to explain the process of getting a lawyer. Scanlon tried to clarify whether appellant still wanted to talk or if he was invoking his right to counsel and terminating the interview. Appellant responded to Scanlon's clarifying questions, stating "I should get one, probably. I guess so. I mean, I guess I should do it. I suppose I should get a lawyer. Oh, yeah, I want one," while also saying that he "didn't mind talking" to Scanlon. Scanlon asked again, "Yes you want a lawyer?" Appellant then said, "Yes sir."

Scanlon terminated the interview and explained to appellant that he would be transported to jail where he would be booked and could make a telephone call.

### Appellant's Motion to Suppress and the Hearing

Prior to trial, appellant filed a motion to suppress, seeking to suppress all oral statements made after he invoked his right to counsel.[2] The trial court conducted a hearing over the course of two days. Detective Scanlon and Officer Basulto both testified, and the State introduced

---

[2] In his motion, appellant sought for the "said [oral] statements [to] be suppressed, and that the prosecutor be instructed not to mention the same in the presence of the jury nor offer any evidence obtained thereby to the jury." Appellant seeks to suppress all statements made after he invoked his right to counsel, all physical evidence derived from those statements, and evidence gathered pursuant to his execution of the consent to search form.

5

into evidence the videotaped interview. The defense presented, as evidence, the videotape recording of appellant in the patrol car.

Basulto testified that he first advised appellant of his rights at the scene of the crime and that appellant stated that he understood his rights. Basulto testified:

> A.     He advised me that he was HIV and Hep C positive. And he also had some keys that were in his right front pocket. He asked if I could give that to his two friends, which he named as Jennifer and Joy.
>
> Q.     And did he ask you to tell Joy and Jennifer anything else?
>
> A.     He asked if they could get him a lawyer.
>
> Q.     Okay. Did you question the suspect in any way?
>
> A.     No.

Basulto recounted that Detective Burgh arrived and asked appellant for consent to search the house to which appellant agreed. Basulto advised Burgh of appellant's request to ask his friends to get him a lawyer. Basulto later transported appellant to the police station where he was interviewed by Scanlon.

Detective Scanlon testified that he had a brief conversation with appellant while he was in the patrol car at the scene to introduce himself and to advise appellant that he would be transported to the police station. At that time, appellant made no statements to Scanlon.

Detective Scanlon testified that he advised appellant of his rights at the beginning of the videotaped interview at the police station:

> Q.     Did you read each right to him and ask whether he understood it?

6

A.    Yes.

Q.    How did he indicate to you that he understood it?

A.    Verbally giving me an affirmative answer, yes or yes, sir.

Q.    And when you—after you advised him of his rights, did he indicate that he would agree to waive his rights and speak to you?

A.    Eventually yes, he did.

Q.    Will you describe what he said in the—what the conversation was when you said "eventually"?

A.    After reading the warning to him, he said that—he asked me the question if he needed a lawyer. I told him that it was not my place to advise him whether or not he needed a lawyer, that that was a decision that he needed to make on his own.

Q.    Did you give him time to make that decision?

A.    Yes.

Q.    Okay. And in fact, did he ponder that decision for about approximately eight minutes?

A.    Yes.

Q.    And what did he ultimately decide about whether he wanted a lawyer or whether he wanted to speak to you?

A.    He decided that he would speak to me up to the point that he no longer wanted to speak to me. And if he decided he didn't want to speak to me anymore, that he would stop at that time.

Scanlon testified that, before appellant terminated the interview, appellant discussed his relationship with his wife, some of his health history, and "some of the things they had been fighting about":

7

They were arguing about an alarm service that was at the house, either discontinuing it or something along that line because the alarm wasn't working properly and that their argument became a physical altercation to the point that I believe he stated it began with Laura McIntosh going out the back door and screaming stuff like "he's hurting me" or something like that, to returning in the house they were actually fighting with each other. And he said that Laura McIntosh had him on the floor and was sitting on top of him and that he struggled to get free and that he finally did get free from Laura, from underneath Laura. And at that point I asked him what happened after he got freed, and that was when he decided he didn't want to talk to me anymore.

Over the next few minutes, Scanlon and appellant went "back and forth" about whether he wanted a lawyer. Scanlon testified that he stopped questioning appellant when appellant said he wanted to talk to a lawyer.

Based upon the above testimony, the trial court made the following findings of fact and conclusions of law:

**Findings of Fact:**

1. The defendant was in custody when he spoke to Detective Kerry Scanlon at the Austin Police Department on March 27, 2005.

2. Detective Scanlon's interview with the defendant was recorded and is in evidence as State's Exhibit 2.

3. Before the defendant made his statement to Detective Scanlon, State's Exhibit 2, he knowingly, intelligently, and voluntarily waived all rights as set out in the warnings and in State's Exhibit 1.

4. The statements made by the defendant were made voluntarily, without any threats or promises.

5. The statement to Officer Basulto, "tell my friends to get me a lawyer," was an indirect request for counsel transmitted to a third party, and not a direct, unequivocal request for counsel.

8

6.    The defendant's discussion with Detective Scanlon regarding an attorney did not constitute a request for counsel.

7.    The defendant's statement, "yes, sir," made after Detective Scanlon's question, "you're asking for a lawyer?" was a request for counsel.

8.    The videotaped interview with the defendant complies with Article 38.22, Texas Code of Criminal Procedure.


**Conclusions of Law:**

1.    Officer Basulto's belief as to whether the defendant had requested a lawyer is not relevant to the Court's determination of whether the defendant's statement constituted a direct, unequivocal request for counsel.

2.    The statements of the defendant in his interview with Detective Scanlon, up to the point where Detective Scanlon asks, "you're asking for a lawyer?" are admissible.

3.    The statements of the defendant in his interview with Detective Scanlon, after he answers "yes, sir" to Detective Scanlon's question, "you're asking for a lawyer?" are not admissible.


## ANALYSIS

Appellant urges on appeal that the trial court abused its discretion in finding that appellant's statement to Officer Basulto—to "tell my friends to get me a lawyer"—was an indirect request for counsel transmitted to a third party, and was not a direct, unequivocal request for counsel. Appellant contends that the motion to suppress should have been granted based on appellant's invocation of his right to counsel in his initial encounter with Basulto.

9

*Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Ross v. State*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We give almost total deference to the trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). But we review *de novo* a trial court's rulings on mixed questions of law and fact if they do not turn on credibility and demeanor of witnesses. *Id.*

*Invocation of Right to Counsel*

To effectuate the Fifth Amendment privilege against self-incrimination, a suspect has the right to consult with an attorney and to have counsel present during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The police must explain this right to the suspect before questioning begins. *Id.* at 479. When a suspect asserts his right to counsel, all interrogation must cease until counsel is provided or until the suspect personally reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Dinkins v. State*, 894 S.W.2d 330, 350 (Tex. Crim. App. 1995). The suspect's assertion for counsel must be unambiguous, that is, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the

circumstances would understand the statement to be a request for an attorney. *Davis v. United States*, 512 U.S. 452, 459 (1994). If the suspect makes an ambiguous or equivocal reference to an attorney that a reasonable officer in the circumstances would have understood only as possibly invoking the right to counsel, questioning need not cease. *Id.* Although it may be good police practice for interviewing officers to clarify a suspect's ambiguous statement regarding counsel, both to protect the rights of the suspect and to minimize the chance of the suppression of evidence in subsequent judicial proceedings, clarifying questions are not required. *Id*. at 461; *Dinkins*, 894 S.W.2d at 352.

When reviewing alleged invocations of the right to counsel, we look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, to determine whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Dinkins*, 894 S.W.2d at 351; *Castillo v. State*, 742 S.W.2d 1, 4 (Tex. Crim. App. 1987).

***Review of Trial Court's Totality-of-the-Circumstances Determination***

Here, the trial court conducted a two-day hearing and heard live testimony from Detective Scanlon and Officer Basulto. The trial court viewed the videotape of the disputed conversation between Basulto and appellant. In addition to its findings of fact and conclusions of law, the trial court observed:

> . . . The court has taken into consideration the videotape as well as the totality of the circumstances with regard to whether the defendant invoked his right to counsel.
>
> And based upon the evidence and all of the relevant case law that was provided by both the state and defense, the court finds that the defendant—what the defendant said to Officer Basulto, as quoted from the video, that this was not an unequivocal

invocation of the defendant's right to counsel. And even though Officer Basulto believed the defendant requested an attorney, the case law is clear.

And to tell you the truth, when I first heard it, without looking at the case law, you feel like he—it's a close call. But I do believe that the case law is clear on this point, and Officer Basulto's belief does not change the law. And what actually happened, it was an indirect request for counsel transmitted to a third party, who was his friend, that he was asking the officer to tell—ask to get counsel and the keys.

The court also found that, "during the actual interview by Detective Scanlon," there were times when appellant talked about a lawyer and whether he needed one: "It was not an unequivocal assertion of his right for an attorney."

We agree with the trial court that appellant's statement to the officer to ask or tell his friends to get him a lawyer was not an invocation of his right to an attorney. It was not the type of direct, unequivocal assertion required to halt any further questioning by the officers. At most, it was an equivocal and ambiguous statement that he might want the services of an attorney at some point. That Basulto reported to other officers that appellant had requested a lawyer does not convert the statement at issue into the type of unequivocal statement required. Moreover, appellant's statements during the course of the interview with Detective Scanlon at the police station were also insufficient to constitute the type of unambiguous statement that a reasonable police officer in the circumstances would understand to be a request for an attorney. *See, e.g.*, *Robinson v. State*, 851 S.W.2d 216, 223-24 (Tex. Crim. App. 1991) (question "Do I need to talk to a lawyer before I sign?" was equivocal). Here, Scanlon's discussions with appellant about whether he needed a lawyer and whether he was invoking his right were efforts to clarify appellant's intent and constitute the "good police practice" allowed by *Davis*. *See Davis*, 512 U.S. at 461.

12

The trial court found that appellant did not articulate his desire to have counsel sufficiently clearly that a reasonable police officer in the circumstances would conclude that appellant invoked his right to counsel.  The record supports the trial court's findings.  Viewing the totality of the circumstances, we hold that the trial court did not abuse its discretion in denying the motion to suppress.

## CONCLUSION

Having overruled appellant's point of error, we affirm the trial court's judgment.


_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed on Motion for Rehearing

Filed:   March 12, 2008

Publish