

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | |
| WILLIAM VIEIRA, | | No. 08-16-00100-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 394th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Hudspeth County, Texas |
| | § | |
| Appellee. | | (TC # CR-05706-394) |
| | § | |

## **O P I N I O N**

William Vieira pled guilty to murdering Todd Cameron. The offense occurred on or about January 1, 2000, but Todd's decomposed remains were not discovered until 2013, following the re-opening of a "cold case" investigation. Before accepting his plea, the trial court overruled Appellant's motion to suppress a confession, other statements made to law enforcement, and the discovery of the body that Appellant had hidden in a hole some thirteen years earlier. This appeal challenges only the trial court's ruling on the motion to suppress, claiming that the authorities (1) refused to honor Appellant's request for counsel, (2) used promises of favors to obtain the confession, and (3) used promises of favors to obtain the location of the buried remains. For the reasons that follow, we affirm.

### FACTUAL SUMMARY

In 2000, Appellant and Todd Cameron lived on separate but adjacent tracts of land in a

community known as Wolf Creek in Hudspeth County, Texas. The community was developed on a 55-square-mile ranch. The desert lots in this area are accessed by dirt roads, have no utilities, and are by any measure, primitive. In 2000, Todd was in his thirties and lived alone. Appellant, who was seventeen years of age, was living with his mother in two buses parked on their tract of land. Appellant lived about a mile from Todd.

Todd stopped communicating with his family after December 1999. The family filed a missing person's report, but the Hudspeth County officials and later the Texas Rangers, were unable to locate him. The case went into a "cold case" status.

In 2013, Constable Bruce Jackson served a warrant for Appellant's arrest for parole violations in Hudspeth County and in Illinois. By that time, Appellant was living in Van Horn. Constable Jackson had previously known Appellant, and recognized him to be a person of interest because he knew that Appellant had lived in the Wolf Creek area at the time of Todd's disappearance. During the course of several interviews, which we describe in more detail below, Appellant eventually confessed to shooting Todd. Appellant claimed that he went to Todd's residence to inquire about some matters, and for no particular reason, Todd struck him with a metal rod. Appellant then got angry, shot Todd, and later that day buried his body in a latrine hole. Several days later, he poured concrete over the body, where it stayed until Appellant eventually took authorities to the site following his confession.

After a grand jury indicted him for murder, Appellant filed a motion to suppress all of his statements. He claimed his several pre-trial statements were involuntary, or they resulted from coercive law enforcement measures. The trial court heard and denied his motion to suppress. Appellant then pled guilty and elected to have a jury assess his punishment. Based on the jury verdict, the trial court sentenced Appellant to 99 years and assessed the maximum possible fine of

2

$10,000.00.  This appeal challenges only the ruling on the motion to suppress.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for an abuse of discretion.  *Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010).  That discretion is tested under a bifurcated standard of review as articulated in *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App. 1997).  *See Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Krug v. State*, 86 S.W.3d 764, 765 (Tex.App.--El Paso 2002, pet. ref'd).  Under that bifurcated standard, we give almost total deference to the trial court's resolution of questions of historical fact, especially when those determinations are based on assessments of credibility and demeanor.  *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex.Crim.App. 2013); *Derichsweiler v. State*, 348 S.W.3d 906, 913 (Tex.Crim.App. 2011).  Likewise, we give the same deference to trial court rulings that apply the law to the facts if those determinations turn on credibility or demeanor.  *Arguellez*, 409 S.W.3d at 662.  We review *de novo* mixed questions of law and fact that do not turn on credibility and demeanor.  *Id*.

When the trial court makes explicit fact-findings, we determine whether the evidence, when viewed in the light most favorable to the ruling, supports them. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex.Crim.App. 2006).  Regardless of whether the motion was granted or denied, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. García-Cantú*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008).  An appellate court may uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex.Crim.App. 2007).

## THE MOTION TO SUPPRESS

Appellant challenges three distinct statements. He was arrested for probation violations on September 18, 2013, and that same day he was interviewed by a Texas Ranger and County Constable. In Issue One, Appellant claims the Ranger and Constable denied him the right to counsel in that initial interview. While he denied any involvement in Todd's disappearance in the first interview, on October 10, 2013 he asked to speak with the Texas Ranger. In that second interview, he confessed to the murder. In Issue Two, Appellant contends that his confession in the second interview was involuntary because it was induced by promises of favors. Despite the information that Appellant provided, the authorities were unable to locate the body. Finally, on October 30, 2013, Appellant provided information to a Hudspeth County Sheriff that led to the precise location of the body. In his third issue, Appellant contends the information he gave to the Sheriff was similarly tainted by promises of favor. We take each issue and interaction with the authorities in turn.

## RIGHT TO COUNSEL

### The September 18, 2013 Interview

After he was arrested for probation violations, Constable Bruce Jackson and Texas Ranger Robert Losoya interviewed Appellant for about two hours. The interview was audio recorded and is referred to as Exhibit 12.1 in our record. The officers did not read Appellant his *Miranda* rights at the outset. Early into the interview, the officers asked Appellant whether he knew Todd or anything about Todd's disappearance. Appellant recalled that Todd was "weird," but provided very little information about him.[1] He had heard that Todd had moved to Montana. The officers questioned whether one of Appellant's friends--"Billy Jack"--might have had something to do with

---

[1] Both Todd and Appellant had been diagnosed at one time or another as schizophrenic.

4

Todd's disappearance. Appellant initially said that Billy Jack likely did not even know Todd, but around the forty-eight minute mark of the interview, Appellant admitted that Billy Jack had obtained Todd's mailbox key, and used it to take a check payable to Todd around the time of the disappearance. According to Ranger Losoya, as they probed with more questions about Todd, Appellant reacted noticeably--his breathing became heavier, his heart rate increased, he began wringing his hands, and he stopped making eye contact. At about the fifty-four minute point, Ranger Losoya read Appellant his *Miranda* rights.

The officers then repeatedly urged Appellant to help them, stating that they knew Appellant had something to get off his chest, that this was his best chance to cooperate, and the problem would not go away. Most of the officers' questions were met with silence or Appellant's claim that he did not know anything and could not help them. At about the one hour and twelve minute mark of the interview, and in response to an open-ended question asking, "What is it that you are you thinking," Appellant stated, "Uh, I am thinking it's about time to get a lawyer, I guess." The officers did not respond to this statement, other than to press their request for Appellant's assistance. The interview continued for approximately another fifty minutes, during which time Appellant expressed minimal knowledge of Todd and never told the officers what he knew about his murder.

Appellant urged below and now on appeal that the trial court should have suppressed any statements made after the *Miranda* warnings were given because Appellant invoked his right to counsel. The trial court held that the interview was non-custodial until the fifty-fourth minute, the point at which the Ranger read Appellant his *Miranda* rights. The trial court also held that the single statement about an attorney was not as a matter of law an invocation of the right to counsel.

While Appellant claims the trial court erred in not suppressing the September 18, 2013

5

interview because he invoked his right to counsel, the text of his appellate argument adds another layer to the claim. He urges that the police used an improper "two-step process" in that they intentionally deferred advising Appellant of his rights until he made an incriminating statement, and then read him his rights to salvage the improperly obtained admission. We address this sub-issue first.

*Miranda v. Arizona* imposes an obligation on the police, *prior* to a custodial interrogation, to apprise the suspect of (1) the State's intention to use any statements to secure a conviction, (2) the right to remain silent, and (3) the right to counsel. 384 U.S. 436, 468-470, 86 S.Ct. 1602, 1624-1626, 16 L.Ed.2d 694 (1966). Texas codifies this requirement in TEX.CODE CRIM.PROC.ANN. art. 38.22 § 3(a)(2)(West 2018). If the police intentionally circumvent these protections by questioning the suspect first, and *then* giving the warnings, they have engaged in a "two-step" or "question first, warn later" interrogation. *See Martinez v. State*, 272 S.W.3d 615, 626 (Tex.Crim.App. 2008). The intent of this two-step tactic is to obtain a confession before the defendant understands his rights, then read the defendant his rights, and have the defendant repeat the confession. *Id.* Texas prohibits the deliberate use of this two-step tactic. *Carter v. State*, 309 S.W.3d 31, 38 (Tex.Crim.App. 2010) (holding that the deliberate employment of a "question first, warn later" interview technique will call for the suppression of a suspect's unwarned and warned statements); *Martinez*, 272 S.W.3d at 626.

While Appellant makes the two-step claim on appeal, it was not urged in the trial court below. His written motion never mentions a "two-step" objection, and only generically claims that his statements were involuntarily obtained. In his argument to the trial court at the hearing, Appellant came closer to the argument, urging that the officers obviously treated Appellant as a person of interest in Todd's disappearance from the outset of their questioning, yet they did not

6

issue any *Miranda* warnings until half-way through the two-hour interview.

Nonetheless, defense counsel never identified the "two-step" process and did not cite any "two-step" jurisprudence on that issue. Nor does the argument really fit the two-step fact pattern. The officers did not circle back after the warning was given to have Appellant repeat any incriminating statement made prior to the warning. After the warning was given, Appellant made no incriminating statements at all. Because a two-step argument was not clearly advanced below, nor would the trial court have understood it as such, it is forfeited on appeal. *See Vasquez v. State*, 483 S.W.3d 550, 556 (Tex.Crim.App. 2016)("Appellant's objection was too imprecise, especially given the time that it was made, to put the trial court or opposing counsel on notice as to the legal basis for [the two-step] objection.").

And even were we wrong on that point, we cannot conclude the trial court erred in rejecting a "question first, warn later" interrogation. The argument is premised on the police's *intentional* use of the tactic to circumvent the *Miranda* and Article 38.22 warnings. *Carter*, 309 S.W.3d at 38; *Martinez*, 272 S.W.3d at 626. Ranger Losoya and Constable Jackson testified that they initially considered Appellant only a person of interest and not a suspect. They knew that he lived near Todd some thirteen years earlier. The trial court appeared to have accepted their contention, finding that the interview was non-custodial until Appellant made a contradictory statement. Some of the officers' questioning presupposed that Billy Jack was responsible. From this, we cannot conclude that the trial court erred.

The main thrust of Appellant's argument is that he invoked, but was denied, the right to counsel. If a suspect requests counsel at any time during a custodial interview, "he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994);

7

*State v. Gobert*, 275 S.W.3d 888, 892 (Tex.Crim.App. 2009), *citing Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This secondary *Miranda* right is "'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Davis*, 512 U.S. at 458, 114 S.Ct. at 2355, *quoting Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1988).

In the context of invoking the right to counsel, a suspect must do so "unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then an officer is not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his rights. [Emphasis in original]. *Davis*, 512 U.S. at 459, 114 S.Ct. 2350. "In *Davis v. United States,* the United States Supreme Court established a 'bright line' between suspects who *might* be asking for a lawyer and those who actually *do* ask for one, holding that only the latter have invoked their right to counsel." [Emphasis in original]. *In re H.V.*, 252 S.W.3d 319, 325 (Tex. 2008). To unambiguously invoke the right to counsel, a suspect need not "speak with the discrimination of an Oxford don." *Davis*, 512 U.S. at 476, 114 S.Ct. 2350 (Souter, J., concurring in judgment). But he "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350. When reviewing alleged invocations of the right to counsel, we look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, to determine whether a suspect's statement can be construed as an actual invocation of the right. *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex.Crim.App. 1995).

We conclude that Appellant's statement -- "I am thinking it's time to talk to a lawyer, I guess" -- falls into the class of ambiguous statements. Words have meaning. In the circumstances here, the simple declarative statement, "It's time to talk to a lawyer" would leave little room for doubt that a suspect invoked the right to counsel. When dressed up with words or phrases expressing some manner of equivocation, however, the meaning of the same phrase blurs. *See, e.g., Davis*, 512 U.S. at 462, 114 S.Ct. 2350 (defendant's statement, "*Maybe* I should talk to a lawyer," was not request for counsel); *Davis v. State*, 313 S.W.3d 317, 338-41 (Tex.Crim.App. 2010)(defendant's statement during police interview, "I *should have* an attorney," did not expressly invoke right to counsel under circumstances presented); *Beham v. State*, 476 S.W.3d 724, 728-31 (Tex.App.--Texarkana 2015, no pet.)("I was *gonna try to see* if I could get a lawyer" did not invoke right to counsel); *cf. Jones v. State*, 742 S.W.2d 398, 405-06 (Tex.Crim.App. 1987)(defendant's statement to police, "I think I want a lawyer," was clear and unequivocal assertion of right to consult with counsel prior to any questioning).

Similarly, some requests that only pose a question are deemed equivocal. *Hartwell v. State*, 476 S.W.3d 523, 529–32 (Tex.App.--Corpus Christi 2015, pet. ref'd)(defendant's question, "should I maybe call my attorney friend and see what he thinks," was not an unequivocal and unambiguous request for counsel); *Williams v. State*, 402 S.W.3d 425, 434 (Tex.App.--Houston [14th Dist.] 2013, pet. ref'd)(defendant's question, "Do I need a lawyer present for this," was equivocal request for counsel); *Gutierrez v. State*, 150 S.W.3d 827, 832 (Tex.App.--Houston [14th Dist.] 2004, no pet.)(where defendant asked, "Can I have [my attorney] present now?" was an ambiguous question about counsel); *Halbrook v. State*, 31 S.W.3d 301, 302 (Tex.App.--Fort Worth 2000, pet. ref'd)(determining that statement, "Do I get an opportunity to have my attorney present?" did not constitute clear and unambiguous invocation of counsel); *Flores v. State*, 30

S.W.3d 29, 34 (Tex.App.--San Antonio 2000, pet. ref'd)(holding that question, "Will you allow me to speak to my attorney before?" was not clear and unequivocal invocation of right to counsel).

Other requests that refer to getting a lawyer at some time in the future also fail to qualify as an unequivocal request. *See Herrera v. State*, 08-11-00193-CR, 2013 WL 4859311, at *7 (Tex. App.--El Paso Sept. 11, 2013, pet. ref'd)(not designated for publication)("Let me see if we can get a lawyer or something, because I don't like the way this is going."); *Dalton v. State*, 248 S.W.3d 866, 873 (Tex.App.--Austin 2008, pet. ref'd), *cert. denied,* 558 U.S. 1013, 130 S.Ct. 555, 175 L.Ed.2d 386 (2009)(suspect's statement to police officer to ask or tell his friends to get him a lawyer was not an invocation of the right to counsel); c*f. Smith v. Illinois*, 469 U.S. 91, 93, 96-97, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984)(holding that defendant unambiguously invoked his right to counsel by stating "Uh, yeah, I'd like to do that" in response to question whether defendant understood his right to counsel).

Conditional words in Appellant's statement made the request equivocal. "*I am thinking it's time to talk to a lawyer, I guess.*" No doubt, the court has recognized that the requirement of unambiguousness comes at the expense of "some suspects who--because of fear, intimidation, lack of linguistic skills, or a variety of other reasons--will not clearly articulate their right to counsel although they actually want to have a lawyer present." *Davis*, 512 U.S. at 460-61, 114 S.Ct. at 2356. The court has balanced this cost against the "significant burden on society's interest in prosecuting criminal activity." *Berghuis*, 560 U.S. at 382, 130 S.Ct. at 2260. "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Id., quoting Davis*, 512 U.S. at 461, 114 S.Ct. at 2350. Recognizing this balance, and comparing Appellant's request to prior cases, we conclude that

based on the totality of circumstances, the request was objectively ambiguous.[2]  We overrule Issue One.

## PROMISES OF FAVORS AND THE CONFESSION

### The October 10, 2013, Confession

In his second issue, Appellant contends that his confession was not given freely and voluntarily because it was made in exchange for promises of favors.  Several weeks after the first interview, Appellant sent a note to Ranger Losoya, requesting a meeting.  His hand-written note stated that the Ranger "is really needing to talk to me about a missing person case. . . .  This is a matter of life and death."  Losoya met Appellant in the Hudspeth County jail the same day, and at the outset read Appellant his *Miranda* and Article 38.22 rights.  Appellant opened the conversation by asking for a deal:  if he helped the Ranger, he needed help in return.  Appellant indicated that he was the only person who knew the whole story about Todd, including the whereabouts of the remains.

When asked what kind of deal he wanted, Appellant stated that he was primarily interested in being with his girlfriend who was dying of cancer.  Appellant had not received any letters from his girlfriend because she could not afford the postage.  Regarding the postage, Losoya said he would see if he "could do something about that."  When Losoya asked if moving Appellant from the Sierra Blanca jail to the Van Horn jail was sufficient for the purposes of being closer to his girlfriend, Appellant stated that he was really looking for "house arrest or something."  However, Appellant acknowledged that he knew the Ranger could not arrange that kind of release on his

---

[2] Nonetheless, the court recognizes that as a matter of "good police practice," an interviewing officer should clarify any ambiguous statement regarding the desire for counsel.  *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356.  That is precisely what happened in *Davis* when the suspect said, "Maybe I should talk to a lawyer."  *Id.*  In our case, neither the Texas Ranger nor the Constable made any follow-up inquiry about Appellant's statement.  And while we might expect more of law enforcement, we cannot say a follow-up inquiry was constitutionally required.

own: "I figured that you didn't have that kind of power. It takes a D.A. or somebody to work that kind of deal. But I just thought I'd talk to you first and see if you could push it through."

Ranger Losoya then left the room for a time, and upon his return stated, "Working on it. Billy. I think we can make it happen. Of course, no promises. No promises. But, you know, you gonna have to give us some good information." Appellant then identified the month Todd went missing, and confirmed that Billy Jack was not involved in his disappearance. Losoya left the room again, and on his return stated that he "made some phone calls" but he did not have "any luck contacting any judges." The Ranger said he would see a judge in the morning but that Appellant was "gonna have to give me something that I can take to him" otherwise "he'll laugh me out of the court. You're gonna have to give me some information that I can tell him in the morning. That's the way it is." Appellant then confessed to shooting Todd and burying his remains on Section 13 at Wolf Creek.

Ranger Losoya then pressed for the exact location of the body, and in particular asked Appellant to go with him that night to pinpoint the site. If Appellant did so, the Ranger promised to take him to see his girlfriend on the way. However, the Ranger reiterated that Appellant's release for any longer was up to the judge. Appellant wanted more than just a brief visit with his girlfriend and declined to provide any more than the Section number of Todd's remains.

Following the hearing on the motion to suppress, the trial court found that Appellant initiated the interview, the law enforcement actions were not coercive, and the confession was voluntary. It further found that "there were no promises made with the intent of eliciting a false confession or that did elicit a false confession." Further, under the totality of the circumstances, Appellant "made the decision to speak of his own free will and that all of the statements were accordingly freely and voluntarily made without intimidation, compulsion or persuasion." On

12

appeal, Appellant contends that the confession was not voluntary because it was induced by several promises.

As a general proposition, only a voluntary confession is admissible in evidence. The Due Process Clause of the United States Constitution prohibits an involuntary confession, but only if the confession results from police overreaching. *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); *Oursbourn v. State*, 259 S.W.3d 159, 169-70 (Tex.Crim.App. 2008). Closely aligned, and under the *Miranda* decision, a statement's admissibility turns on whether a defendant voluntarily waived the right to silence and counsel. *Connelly*, 479 U.S. at 169–70, 107 S.Ct. at 523. The focus under *Miranda*, like the Due Process Clause, is police conduct. *Id.* ("*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."); *Oursbourn*, 259 S.W.3d at 169-70.

Texas codifies and expands these protections. "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX.CODE CRIM.PROC.ANN. art. 38.21 (West 2005); *State v. Terrazas,* 4 S.W.3d 720, 723 (Tex.Crim.App. 1999). The Court of Criminal Appeals concluded that Article 38.22 § 6 also allows a court to consider circumstances beyond police conduct. *Oursbourn*, 259 S.W.3d at 172. "But Section 6 of that article may also be construed as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement."

Whether a defendant's statement is voluntary is determined from the totality of the circumstances. *See Penry v. State*, 903 S.W.2d 715, 748 (Tex.Crim.App.), *cert. denied,* 516 U.S. 977 (1995). A statement is not voluntary if there is "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free

13

and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App. 1995). A statement is also involuntary if circumstances show that the confession was induced by a promise of a benefit. *See Ramirez v. State*, 76 S.W.3d 121, 126-127 (Tex.App.--Houston [14th Dist.] 2002, pet. ref'd). For a promise to render a confession involuntary, however, the promise must be (1) positive, (2) made or sanctioned by one in authority, and (3) of such an influential nature as to cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 793 (Tex.Crim.App. 2004); *Henderson v. State*, 962 S.W.2d 544, 565 (Tex.Crim.App. 1997).

The truth or falsity of the statement is immaterial; the question is whether the promise likely would induce a false confession. *Martinez*, 127 S.W.3d at 794-95; *Coleman v. State*, 440 S.W.3d 218, 223-24 (Tex.App.--Houston [14th Dist.] 2013, no pet.). Generally, unspecific offers to help are not likely to induce one to make an untruthful statement and will not invalidate a confession. *Dykes v. State,* 657 S.W.2d 796, 797 (Tex.Crim.App. 1983). Similarly, general statements made to a suspect regarding how a confession may result in leniency do not render a confession involuntary. *Muniz v. State*, 851 S.W.2d 238, 253-54 (Tex.Crim.App. 1993). Predictions about future events are not a promise. *Mason v. State*, 116 S.W.3d 248, 261 (Tex.App.--Houston [14th Dist.] 2003, pet. ref'd)(officer's statements that the situation would "go better" for appellant by giving a confession was a prediction about a future event and not a promise).

An early United States Supreme Court decision, quoting a treatise, condemned "any direct or implied promises, however slight" that might be used to induce a confession. *Bram v. United States*, 168 U.S. 532, 542-43,18 S.Ct. 183, 187, 42 L.Ed. 568 (1897), *quoting* 3 H. Smith & A. Keep, Russell on Crimes and Misdemeanors 478 (6th ed. 1896). And while the "however slight" language has been repeated in several decisions, the court has more recently stated the phrase from *Bram* "does not state the standard for determining the voluntariness of a confession[.] *Arizona v.*

14

*Fulminante*, 499 U.S. 279, 286, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302 (1991); *see also Martinez v. State*, 127 S.W.3d 792, 796 (Tex.Crim.App. 2004)(noting rejection of *Bram* standard in favor of looking to likely effect of the promise made).

Appellant contends that his confession on October 10, 2013 was not voluntary because it was made in response to offers of (1) postage for his girlfriend, (2) a transfer to the jail in Van Horn, (3) the Ranger talking to the judge about getting Appellant released, and (4) a visit with Appellant's girlfriend if he would take them to the gravesite. We disagree. Ranger Losoya's statement that he would "see" if he "could do something about" the postage was not an affirmative promise. Moreover, the Ranger made the statement about postage approximately eighty minutes before Appellant disclosed the details of the murder. It was made only once, and never acknowledged by Appellant. Even if considered as a promise, it was not of a "nature that it would cause a defendant to speak untruthfully." *Martinez,* 127 S.W.3d at 793; *Jacobs v. State*, 787 S.W.2d 397, 399-400 (Tex.Crim.App. 1990)(promise to allow one-hour visit by girlfriend would not cause defendant to incriminate himself).

After Appellant made it clear that he was looking for a deal, Ranger Losoya asked, "If we were to take you to Van Horn, to that jail, would that be sufficient?" Appellant replied that he was really looking for something else -- "maybe house arrest or something." In context, Ranger Losoya was merely asking a question, and not making an affirmative promise. His statement was a standard negotiating ploy: "If I offer X, will you accept it?" And in the course of the negotiation, Appellant said no, he wanted something different. Thus, the trial court did not err in concluding that no promise was made, much less one that would cause Appellant to admit to a crime he did not commit.

To address what Appellant really wanted, Ranger Losoya repeatedly stated that he would

appear before a judge to ask for some type of pre-trial release. He disclosed that he did not know the judge, but had only heard from others that the judge would require him to have some good facts to justify any deal. The Ranger repeatedly told Appellant that he could not make any promises, nor predict what the judge would do. Rather, Losoya promised to make an appeal to the judge for an accommodation that was within the judge's sole discretion. His promise was functionally the same as a promise to ask a judge or prosecutor for leniency if a defendant confesses. Moreover, courts have held that *requests* for leniency are not a promise of a benefit so as to make a confession involuntary. *See Muniz*, 851 S.W.2d at 254 (statement that leniency was sometimes shown when a defendant confessed was insufficient to render confession involuntary); *Hernandez v. State*, 421 S.W.3d 712, 721-24 (Tex.App.--Amarillo 2014, pet. ref'd)(noting difference between true *quid pro quo* promise of leniency versus merely presenting fact of cooperation to the judge); *Coleman v. State*, 440 S.W.3d 218, 224 (Tex.App.--Houston [14th Dist.] 2013, no pet.)(statement that defendant could help himself by confessing, or that the officer was attempting to help defendant, were not positive promises of leniency); *Herrera v. State*, 194 S.W.3d 656, 660 (Tex.App.--Houston [14th Dist.] 2006, pet. ref'd)(holding that the statement, "We can talk to the D.A., get you an offer, if you can help us," was not specific enough to influence appellant to speak untruthfully); *Drake v. State*, 123 S.W.3d 596, 603 (Tex.App.--Houston [14th Dist.] 2003, pet. ref'd)(officer's general, non-specific statement that the defendant "could help herself" did not render appellant's statement involuntary). Merely promising to convey the fact of a defendant's cooperation by itself does not invalidate a confession. *Johnson v. State*, 68 S.W.3d 644, 654 (Tex.Crim.App. 2002)(officer's representation that an accused's cooperation would be conveyed to the trial court was not a promise inducing a confession). Ranger Losoya promised no more than he would talk to a judge that he did not know, and ask for an accommodation that was

16

solely up to the judge. We think it unreasonable to believe a person would speak untruthfully, confessing to acts they did not commit, on the strength of such a vague promise.

Nor is the last promise -- to take Appellant by his girlfriend's house -- of any consequence. The Ranger made that promise *after* Appellant confessed, and did so to induce Appellant to take the officers out that night to find the body. Appellant never accepted the invitation. We overrule Issue Two.

## PROMISES OF FAVORS AND DISCOVERY OF THE BODY

### The Discovery of the Body

In his third issue, Appellant complains that the police induced him to give them the location of the body in exchange for promises of favors. He sought to suppress his statement disclosing the location of the body, as well as the remains themselves, as "fruit-of-the-poisonous-tree."

Following the October 10 confession, Ranger Losoya made several efforts to locate the body. On October 16, he took Appellant to Wolf Creek but they were unable to find the remains in a field that Appellant led them to. A week later, a cadaver dog was unable to pick up any scent in the same field. On October 29, Appellant had drawn a rough map that was also of no help. Ranger Losoya planned to return to Wolf Creek the next day with Appellant and more personnel.

Sheriff Arvin West was responsible for transporting Appellant to the site on October 30. Appellant testified that prior to transport, Sheriff West told Appellant that he "could make things hard or easy on me while I was [jail]." Sheriff West also supposedly promised to give Appellant "3-to-1 good time" during his stay in the Hudspeth County jail, and allow him to stay there as "long as he possibly could." In exchange, Appellant would have to take him to the body. This interaction was not recorded, and the State conceded it could not show that Appellant was read his *Miranda* rights by Sheriff West. Sheriff West did not testify.

17

Confirming at least part of Appellant's claim, Constable Jackson testified that on the morning of October 30, Sheriff West called and asked whether there was a white fiberglass structure on the property. The Sheriff stated that was the gravesite's location. Sheriff West, his team, and Appellant, arrived at the Wolf Creek property first that morning. By the time Constable Jackson and Ranger Losoya arrived, the Sheriff's crew was already processing the scene by photographing the gravesite at the white fiberglass structure, apparently an abandoned out-house. Ranger Losoya then interviewed Appellant again, and after reading him his *Miranda* rights, obtained a second recorded confession.

The State did not seek to admit any of the statements that Appellant made to Sheriff West. It did seek to admit proof of the skeletal remains, and other physical evidence from the gravesite. At the suppression hearing, Appellant contended that without the directions given to Sheriff West on October 30, the authorities would not have discovered the location of the body and confirmed the murder. The trial court overruled the motion to suppress, finding in part that the "results of the statement was to provide verifiable facts which ultimately proved to be true, specifically the location of the body."

On appeal, Appellant complains that the promises and threats purportedly made by Sheriff West violate Article 38.22. Yet he candidly acknowledges the statutory provision would not apply because of the exception in Article 38.22 § 3(c). Article 38.22's exclusion does not apply to "assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused[.] *Id.* Here, any statement improperly taken by Sheriff West directed authorities to a provable fact (the location of the body) and thus Article 38.22 offers no basis to reverse the judgment. The trial court found as much in his findings specific to this claim.

Now on appeal, Appellant focuses on the Due Process Clause to the United States

18

Constitution and Article I, Section 10 of the Texas Constitution, claiming that his statements were coerced, and any resulting discovery because of those statements must be excluded under the "fruit-of-the-poisonous-tree" doctrine.[3] We disagree.

A federal due process violation requires a finding of (1) police overreaching that (2) resulted in an involuntary confession. *Connelly*, 479 U.S. at 165, 107 S.Ct. at 521; *Oursbourn*, 259 S.W.3d at 169-70. With regard to all of Appellant's statements, the trial court made this finding:

> I find that law enforcement conduct was not abusive, coercive, was of reasonable length and setting. There was no brutality, no threats of brutality or coercion. I find that there was no police misconduct. I find that there were no promises made with the intent of eliciting a false confession or that did elicit a false confession.

The trial court also made findings that Appellant made all of the statements voluntarily, which implicitly negates any coercive effect of Sheriff West's statements, even if they were made as Appellant describes:

> I find that the totality of the circumstances demonstrate that the Defendant made the decision to speak of his own free will and that all of the statements were accordingly freely and voluntarily made without intimidation, compulsion or persuasion.
>
> I find that the Defendant was aware of his rights, knowingly and intelligently waived those rights in each statement. And to clarify, I find beyond a reasonable doubt, as a matter of law in fact, that all statements were freely and voluntarily made and are admissible.

The record supports these findings.

Whether a confession was voluntary is a mixed question of fact and law that may turn on

---

[3] An appellant is required to raise state and federal constitutional claims as separate grounds with separate substantive analysis or argument provided for each ground. *See Berry v. State*, 233 S.W.3d 847, 855 n.3 (Tex.Crim.App. 2007); *Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex.Crim.App. 1993); *Heitman v. State*, 815 S.W.2d 681, 690-91 n.23 (Tex.Crim.App. 1991). Further, he must show how the protection provided by the Texas Constitution exceeds or differs from that provided by the federal constitution. *Arnold v. State*, 873 S.W.2d 27, 33 (Tex.Crim.App. 1993). Appellant does not argue that the Texas Constitution provides different or greater protection than the United States Constitution. Consequently, we will restrict our analysis of his claims to the applicable federal constitutional provisions. *See Flores v. State*, 319 S.W.3d 697, 702 n.8 (Tex.Crim.App. 2010); *Muniz*, 851 S.W.2d at 251-52.

19

credibility and demeanor. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex.Crim.App. 2002); *Williams v. State*, 502 S.W.3d 262, 271 (Tex.App.--Houston [14th Dist.] 2016, pet. ref'd); *Casique v. State*, 08-04-00271-CR, 2005 WL 1965590, at *4 (Tex.App.--El Paso Aug. 16, 2005, no pet.)(not designated for publication). We accord almost total deference to mixed questions of law and fact that turn on credibility and demeanor. *Arguellez*, 409 S.W.3d at 662.

By the time Sheriff West transported Appellant to Wolf Creek, Ranger Losoya had already interviewed him at least four times, and in each of those interviews, and he was read and acknowledged his *Miranda* rights. During the course of those interviews, Appellant had proven to be less than a reliable reporter. In his first interview on September 13, Appellant denied knowing anything about Todd's disappearance. On October 10, he admitted to shooting Todd. On October 16, he took authorities to the supposed burial site, which turned out to a "wild goose chase." When Appellant was taken back to Wolf Creek on October 20, he recanted his earlier confession and claimed that Billy Jack had borrowed his van and gun, and later told him that he had shot Todd and buried the body. On that same site visit, he first claimed that he did not know the exact location of the body, but then finally agreed to take authorities to a culvert where Billy Jack told him the body was buried. Authorities found nothing in that location. Nine days later, he drew a map that proved useless in finding the location of the grave. By his own admission at the suppression hearing, he had lied to the authorities about the location of the body. On October 30, he then again confessed to the crime and absolved Billy Jack.[4]

The linchpin of Appellant argument is that absent Sheriff West's claimed promises and threats, Appellant would not have disclosed the location of the body. By finding that all of Appellant's statements were given freely and voluntarily, the trial court concluded otherwise.

---

[4] We do not understand Appellant to complain about this last confession, which was also preceded by *Miranda* warnings, and which repeated the details of what Appellant had first confessed on October 10.

20

Because Appellant had already told the authorities multiple and conflicting stories, the record amply supports why the trial court would not be compelled to accept any of Appellant's subjective claims of what motivated him to finally disclose the location of the gravesite. Paying almost total deference to the trial court's findings, as we must, we conclude Appellant's statements were voluntary and not coerced, which defeats Appellant's federal due process claim.

There was additional evidence that Appellant disclosed the location of the grave voluntarily, and not in reference to any threat or promise. Ranger Losoya arrived at the Wolf Creek scene after Appellant was already there. Ranger Losoya read Appellant his *Miranda* rights, and Appellant confessed to killing Todd and additionally described how and where he hid the body. He did so without mentioning the alleged deal of a 3-1 good time credit, or threat of bad treatment. If the threat or promise was important to disclosing the location of the body, it would have been natural for Appellant to have so informed Ranger Losoya, the lead investigator on the case, when he described the body's location.[5]

Appellant's argument also relies on the "fruit-of-the-poisonous-tree" doctrine from *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). That doctrine, however, does not apply to a mere failure to provide *Miranda* warnings to a suspect prior to a custodial interrogation when the suspect makes a voluntary statement: while the statement must be suppressed, the "fruit" obtained as a result of that accidentally unwarned statement need not be suppressed. *United States v. Patane*, 542 U.S. 630, 639, 124 S.Ct. 2620, 2628, 159 L.Ed.2d 667 (2004) (holding the accidental failure to give suspect *Miranda* warnings did not require

---

[5] The State also argues this second confession is sufficiently attenuated from any taint of Sheriff West's statements, so as to be an independent source for the location of the body. *See Segura v. U.S.*, 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984)("In short, it is clear from our prior holdings that the exclusionary rule has no application [where] the Government learned of the evidence from an independent source.")(internal quotes omitted). In light of our view that the trial court's findings adequately dispose of Appellant's claim, we need not reach this alternative claim.

21

suppression of physical fruits of suspect's unwarned but voluntary statement); *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985)(holding accidentally unwarned statements may be used to impeach defendant's testimony at trial). Instead, the doctrine applies when the defendant shows a statement was actually coerced by authorities. *Baker v. State*, 956 S.W.2d 19, 22 (Tex.Crim.App. 1997). The trial court here found just the opposite.

Finally, Appellant contends that under the Texas statutory exclusionary rule--Article 38.23(b)--any evidence obtained in violation of federal law must be excluded. TEX.CODE CRIM.PROC.ANN. art. 38.23(b). But the trial court's findings negate a claim of a due process violation. And while the parties appear to agree that Sheriff West did not read Appellant his *Miranda* rights, the mere failure to adhere to *Miranda* does not require exclusion under Article 38.23(b). *Baker*, 956 S.W.2d at 24 ("Therefore, mere violations of the *Miranda* rule are not covered by the state exclusionary rule contained in Article 38.23.").

Considering the totality of the circumstances, the record supports the trial court's findings and giving them due deference, we overrule Issue Three and affirm the judgment of conviction below.

June 22, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

22